**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARKUS BUCHANAN (#B-78892), AND JEREMIAH L. CAMPBELL (#S-08726), | ) ) | |
| PLAINTIFFS, | ) ) | CASE NO. 17-CV-8075 |
| V. | ) ) | |
| | ) | HON. SHARON JOHNSON COLEMAN |
| WARDEN RANDY PFISTER, | ) ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Markus Buchanan and Jeremiah Campbell, two Illinois state prisoners, have brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiffs claim that Defendant Randy Pfister, the Warden of the Stateville Correctional Center, violated Plaintiffs' constitutional rights by acting with deliberate indifference to their health and safety. More specifically, Plaintiffs allege that Defendant failed to adequately address an infestation of skunks and groundhogs on the prison grounds during his tenure at Stateville. The Court previously dismissed all other Defendants, either on preliminary review or pursuant to motion. Currently before the Court is the sole remaining Defendant's motion for summary judgment. For the reasons set forth in this order, the motion is granted.

**Plaintiffs' Motion to Strike Summary Judgment Evidence**

Plaintiffs' motion to strike the declaration of Stateville Grievance Officer Anna McBee is denied. Plaintiffs correctly point out that affidavits and declarations in support of or opposition to a motion must be based on personal knowledge, must set out facts that would be admissible in evidence, and must show that the affiant or declarant is competent to testify concerning the matters stated. *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 559 (7th Cir. 2019) (citing Fed. R. Civ. P. 56(c)(4)). Here, the Court is satisfied that McBee's declaration meets all of the above criteria.

McBee is competent to testify what she did and did not find among prison records.   McBee states that she is a grievance officer, that the facility logs all inmate grievances, and that she could not find any grievances from either Plaintiff asking prison officials to remedy the ostensible skunk and groundhog problem.   (R. 93-11, Defendant's Exhibit G, Declaration of Anna McBee, ¶¶ 2-5.)   Plaintiffs argue that McBee's declaration contains "conclusory allegations, speculation, unsubstantiated assertions, and … legalistic argumentation."   (R. 97, Pltffs. Motion to Strike, ¶ 7.)   The Court disagrees.   It may be true that McBee lacks legal or medical expertise, but the Court finds that her statements convey straightforward facts and do not go beyond the scope of her work as a prison grievance officer.   Similar affidavits are routinely filed in prisoner litigation.   Furthermore, insofar as Defendant discusses the content of Plaintiffs' two grievances relating to skunks and groundhogs, she has provided copies of those grievances so that the Court can draw its own conclusions about what they say or do not say.   Accordingly, Plaintiffs' motion to strike Anna McBee's declaration is denied.

**Background**

Plaintiff Markus Buchanan, during the relevant time periods referred to in the complaint, was incarcerated at the Stateville Correctional Center.   (R. 93-2, Defendant's Local Rule 56.1(a) Statement of Uncontested Material Facts, ¶ 1.)   Plaintiff Jeremiah Campbell was also a Stateville inmate at all times relevant to this lawsuit.   (*Id.*, ¶ 2.)   Campbell remains at Stateville as of the date of this Opinion.   *See* Illinois Department of Corrections Offender Page https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (visited February 5, 2020.)

Defendant Randy Pfister was Stateville's warden from November 12, 2015, until January 31, 2018.   (Deft. SOF, ¶ 3.)

In or around 2012, a walkway area between Stateville's B-House and C-House began to see an increase in the number of groundhogs and skunks. (*Id.* ¶ 4.) Some 15 skunks and 30-40 groundhogs live(d) on the grounds along the walkway. (*Id.*)

During certain times of day, up to 20 or more animals populate the pathway, begging passersby for food or foraging in the grass. (R. 100, Plaintiffs' "Statement of Genuine Disputes," ¶ 4.) Sometimes the animals fight with each other or show aggression to people on the path. (*Id.*) The walkway is about 8 feet wide; a fence lines the entire length along both sides of the walkway. (*Id.*) Thus, there is no easy means of "escap[ing]" the skunks and groundhogs in that enclosed area. (*Id.*)

Inmates use the walkway to go to the dining room, religious services, the library, and the visitor center. (Deft. SOF, 5.) It is about a 1-minute walk through the walkway, unless the inmate is stopped for some reason. (Deft. SOF, ¶ 5; Pltffs. SGD, ¶ 5.) Depending upon the reason, inmates can be detained on the walkway for up to 5 or even 15 minutes. (Pltffs. SGD, ¶ 5.)

Plaintiffs traverse(d) the walkway perhaps 4 times a day. (Deft. SOF, ¶ 6.)

To date, groundhogs have never attacked, bitten or harmed Plaintiffs in any way. (*Id.*) But Plaintiffs are aware of instances where groundhogs have attacked or bitten other fellow prisoners in their housing unit. (Pltffs. SGD, ¶ 6.) Plaintiffs therefore suffered "psychological harm and emotional distress" from fear of being attacked. (*Id.*)

On November 26, 2016, an officer ordered Plaintiffs and 40 other inmates to stop "in the worst and most dangerous spot" of the walkway. (Pltffs. SGD, ¶ 5.) A skunk suddenly appeared and released its spray on Plaintiffs. (Deft. SOF, ¶ 7.) That was the only time a skunk ever sprayed Plaintiffs. (*Id.*)

Following the skunk encounter, correctional officials escorted Plaintiffs to the prison's health care unit, where a nurse washed their faces with peroxide, hand sanitizer, soap, and water, and

encouraged them to continue washing when they reached their cellhouse.[1]  (*Id.*, ¶ 8.)  The smell abated after a few days, but Plaintiffs continued to suffer from blurred vision, itching, a burning sensation, and red, raw skin for over a week.  (Pltffs. SGD, ¶ 9.)

At an appointment on December 7, 2016, a prison optometrist or ophthalmologist treated Plaintiff Buchanan's blurred vision and sore eyes with an application of medicated eye solution, and authorized the issuance of new eyeglasses.  (*Id.*)

Plaintiff Buchanan never wrote letters to Defendant Pfister or spoke to him in person about his concerns of an infestation of skunks and groundhogs at Stateville.  (Deft. SOF, ¶ 10.)  Buchanan never filed a grievance specifically requesting the administration to eradicate the skunks and groundhogs.  (*Id.*, ¶¶ 11, 13.)

Plaintiff Buchanan filed an emergency grievance on December 6, 2016, concerning the recent skunk attack and the perceived need for medical treatment.  (Pltffs. SGD, ¶ 13.)  Buchanan wrote:

> About 5:00 p.m., November 27, 2016 I was on my way to chow with C-house 10 gallery.  Officer Genge stopped the line at the second yellow line in front of B-house before turning left to chow hall.  At this point the entire line was lined up along the fence, which is only inches from the sidewalk.  Where I was standing there is 4 or 5 groundhog holes directly between the fence and sidewalk, and another 10-20 groundhog holes in the immediate area.  When Officer Genge ordered the line to proceed on to chow a skunk emerged from one of the holes and began to attack offender [redacted] and I without provocation or warning.  I felt the skunk physically hit my leg before I even knew what it was or could move away; and in that same moment the skunk began spraying us.  I was hit in my face, right eye, mouth, and body from my shoes up my right side to my head, and immediately started choking and even vomited.  Officer [redacted] and about 90% or more of the line witnessed the skunk attack me and will testify it was without warning, unprovoked, and happened as described *supra*.  Officer Genge imme- diately rushed us to the Stateville Medical Department, because I was suffering vision loss in my right eye; soreness, itching, swelling and a rash to my face, eye, throat, and neck; vomiting; and smell on my entire body.  We were attended to by Nurse Virginia and another nurse whose name I don't

---

1 The Court previously granted certain Defendants' motion to dismiss Plaintiffs' claim that they received constitutionally inadequate medical care for the effects of skunk spray.  *See* R. 63, Memorandum Opinion and Order of October 1, 2018.

know. However, we were told that we could not be treated because the medical department didn't have anything to treat us with. Nurses Virginia and Jane Doe did what they could with water to flush out my eye without no success. Nothing else could be done adequately or professionally so the nurses told us to wash ourselves with water when we got back to the cellhouse and to throw away our clothes. When we returned to C-house we were laughed at and alienated by offenders and staff alike; and, again, we were told by staff to throw away our clothes (including Nike Air Force Ones, thermal shirt, ear muffs, and entire state-issued uniforms) because the entire cellhouse began to reek with the smell, and Sgt. Mayes and Lt. Davis allowed us to take a shower, which didn't have much success either. That same night, during her rounds Virginia brought me eyedrops to help until I could get adequate treatment for my eye. The next day 11/28/16 I asked Officer Lutergey and the Sgt. take me to medical department, but when they called to notify medical of my coming, medical told them I need to put in for sick call instead despite my complaints of blurred vision; itching; burning and red rawness of face and neck; and putrid [page is partially cut off] by sick call. On [last line of page cut off].

(R. 93-9, Defendant's Exhibit E, Offender's Grievance, pgs. 2-3.) In the "Relief Requested" section, Buchanan asked for "New Nike Air Force Ones, Adequate Medical Treatment, and a transfer to Dixon C.C. or reasonable compensation for my injuries; pain and suffering; and lack of medical treatment." (*Id.*, p. 2.)

Defendant Pfister declined to treat the grievance as an emergency matter. (Pltffs. SGD, ¶ 13.) Plaintiff Buchanan's counselor directed him to submit a sick call request if he needed medical attention, and further informed Buchanan that he was ineligible to re-apply for a transfer for six months because he had already recently requested and been denied a transfer. (Deft. Exhibit E, p. 2.)

Plaintiff Campbell likewise never wrote to Pfister or had any "face-to-face interaction" with him regarding the alleged over-population of skunks and groundhogs at Stateville. (Deft. SOF, ¶ 14.) Campbell filed a grievance concerning his medical care on December 5, 2016. (*Id.*, ¶ 15.) Campbell's grievance stated as follows:

At or about 5:00 I was on my way to chow with C-house 10 gallery. The officers on the walk stopped the line at the second yellow line near B-house, before making a left

turn going toward the chow hall. While stopped at the second yellow line, the entire chow line was lined up along the fence, inches away from the side walk. Where I was standing along the fence and sidewalk, there's 4 or 5 holes that the ground hogs [live in] directly between the fence and sidewalk and approximately 10-20 ground hog holes in the immediate vicinity. When Officer Genge ordered the chow line to proceed, a skunk came out of one of the holes and without being provoked or a warning attacked offender [Redacted] and [me.] [W]hen the skunk attacked and sprayed us the spray landed in my mouth, face and on my clothes and shoes. I instantly felt a burning sensation on my face, numbness in my mouth and became extremely nauseated and sick to my stomach. Officer Genge, along with 85-90% of the chow line (people present) witnessed the skunk attack and will testify that it was unprovoked and without warning as mentioned (described) above. I suffered the physical symptoms described above along with having to walk around with the vile odor. Officer Genge rushed [redacted] and I to health care. We were attended to by nurse Virginia and Tina who told us that they couldn't [treat] us adequately and professionally because the health care didn't have anything readily available to treat someone who's been sprayed by a skunk. Nurse Virginia and Tina treated me with hand sanitizer and peroxide, which was not helpful at all. We were then told to rinse the affected areas in water while they looked for something to treat us with and told us to throw everything we were wearing away. When we arrived back to C-house we were instantly ridiculed and outcasted by staff and offenders. Once again we were told by staff to throw everything we were wearing away (including Nike Air Force One sz 9, 1 skull cap, stretch t-shirt, thermal shirt, T shirt and boxers), state-issued coat, shirt and pants. Lt. Davis and Sgt. Mayes allowed us to take a shower which didn't relieve the physical symptoms or the smell on my skin. The next day I requested to go to health care and Officer Lethergy and Sgt. Aubrey told me to put in a sick call despite my complaints of burning skin, numbness in my mouth and nausea. As of today I have not received any medical treatment for my physical and/or medical conditions which are the result of the unsafe and [un]sanitary conditions of Stateville Corr. Center.

(R. 93-10, pgs. 2-3, Offender's Grievance.) Campbell requested "[a]dequate medical treatment, reasonable compensation for my injuries, pain and suffering and lack of medical treatment, Nike Air Force Ones and thermal shirt. (*Id.*, p. 2.)

A physician in the health care unit informed the investigating grievance officer that no "medical treatment" *per se* would have been rendered for being sprayed by a skunk; rather, one must simply wash the spray off to the best of one's ability. (Deft. Exhibit F, p. 1; *see also* p. 4, Memo from Medical Staff to Grievance Counselor.) The grievance officer recommended that the grievance be denied as Campbell "appear[ed] to be receiving appropriate medical care at this time." (*Id.*)

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hanover Ins. Co. v. Northern Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). In determining whether factual issues exist, the Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Weber v. Univ. Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). The Court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)).

To survive summary judgment, the nonmoving party must make a sufficient showing of evidence for each essential element of his case on which he bears the burden at trial. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017) (citing *Celotex*, 477 U.S. at 322-23). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 656 (7th Cir. 2014) (citations omitted). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 334 (7th Cir. 2011) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)).

**Discussion**

No material facts are in dispute, and Defendant has established that he is entitled to judgment as a matter of law. Defendant has demonstrated that Plaintiffs failed to exhaust administrative remedies with respect to the claim they assert against Defendant Pfister prior to bringing suit. Regardless, even viewing the record in the light most favorable to Plaintiffs, the Court finds that no

reasonable trier of fact could conclude that Defendant either acted with deliberate indifference to a substantial risk of harm, or failed to provide Plaintiffs with a healthy, habitable environment. In any event, the Court additionally concludes that Defendant is entitled to qualified immunity.

## A. Plaintiffs Failed to Exhaust Administrative Remedies

The Prison Litigation Reform Act of 1996 contains a comprehensive administrative exhaustion requirement. Under that statute, "[n]o action shall be brought with respect to prison conditions ... by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a); *see also Jones v. Bock*, 549 U.S. 199, 204 (2007); *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011). "[I]f a prison has an internal administrative grievance system through which a prisoner can seek to correct a problem, then the prisoner must utilize that administrative system before filing a claim under Section 1983." *Massey v. Helman*, 196 F.3d 727, 733 (7th Cir. 1999); *Lyles v. Gambino*, No. 14 CV 1406, 2019 WL 2511868, at *8 (N.D. Ill. June 17, 2019) (same).

In order to satisfy the PLRA's exhaustion requirement, a prisoner "must take all steps prescribed by the prison's grievance system." *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004); *Smith v. Gomez*, No. 17 CV 5029, 2019 WL 2288015, at *2 (N.D. Ill. May 29, 2019) (same) (citations omitted). An inmate must comply with the rules established by the State with respect to the form, timeliness, and content of grievances. *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004); *Pozo v. McCaughtry*, 286 F.3d 1022, 1023-25 (7th Cir. 2002); *Torres v. Pfister*, No. 15 CV 11547, 2017 WL 3386120, at *4 (N.D. Ill. Aug. 7, 2017). Administrative remedies have not been exhausted unless the inmate has given the process a chance to work and followed through with administrative appeals. *Worthem v. Boyle*, 404 F. App'x 45, 46 (7th Cir. 2010) (unpublished opinion) (citing *Ford*, 362 F.3d at 398-400; *Dixon v. Page*, 291 F.3d 485, 490-91 (7th Cir. 2002)). If a prisoner fails to properly avail himself of the prison's or jail's grievance process, then he may lose his right to sue. *Fleming v. Illinois Dep't of Corr.*, No. 16 CV

50074, 2017 WL 1833207, at *3 (N.D. Ill. May 8, 2017); *see also Torres*, 2017 WL 3386120, at *4 (same) (citing *Massey*, 196 F.3d at 733).

The Illinois Department of Corrections has a formalized, three-step grievance process for prisoners. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016); *Towns v. Holton*, 346 F. App'x 97, 99 (7th Cir. 2009) (unpublished); *Nally v. Obaisi*, No. 17 CV 2902, 2019 WL 6527953, at *2 (N.D. Ill. Dec. 4, 2019); 20 Ill. Admin. Code § 504.810. "Step one requires the inmate to attempt to resolve the problem through his or her counselor." *Nally*, 2019 WL 6527953, at *2 (quoting *Pyles,* 829 F.3d at 864). "If that does not resolve the problem, the inmate must invoke step two, which involves the filing of a written grievance with a grievance officer." *Nally*, 2019 WL 6527953, at *2 (quoting *Pyles,* 829 F.3d at 864). If the grievance officer denies the grievance and the chief administrative officer (usually the warden) affirms the denial, the inmate may then appeal the decision to the Director of the Illinois Administrative Review Board (ARB). *Nally*, 2019 WL 6527953, at *2 (quoting *Pyles,* 829 F.3d at 864); *see also* 20 Ill. Admin. Code § 504.850(a).

Correctional officials bear the burden of pleading and proving failure to exhaust. *See, e.g., Jones*, 549 U.S. at 212 (inmates need not specifically plead exhaustion); *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018) ("It was not [the inmate]'s burden to establish that the grievance process was unavailable; it was the officers' burden to show that [the inmate] did not exhaust available remedies"); *Kaba v. Stepp*, 458 F.3d 678, 681 (7th Cir. 2006) ("it is important to remember that exhaustion is an affirmative defense, and consequently the burden of proof is on the prison officials").

In the case at bar, there is no dispute as to whether Plaintiffs either filed grievances after their clash with a skunk, or finalized the grievance process; however, those grievances did not put Defendant on notice that they were specifically seeking a solution to a skunk and groundhog problem at Stateville.

9

Plaintiffs' grievances, the focus of which was their perceived need for medical attention, were insufficient to alert Warden Pfister that they sought to remedy a pest infestation. "Grievances are intended to allow prisons to address complaints about the program it administers before being subjected to suit, reduce litigation to the extent complaints are satisfactorily resolved, and improve litigation that does occur by leading to the preparation of a useful record." *Maddox*, 655 F.3d at 720 (citing *Jones,* 549 U.S. at 219) (internal punctuation omitted).

In *Maddox*, the U.S. Court of Appeals for the Seventh Circuit found that the prisoner-plaintiff's grievance "served its function by providing prison officials a fair opportunity to address his complaint." 655 F.3d at 722. Because the plaintiff in that case was complaining about an administrative decision (the cancellation of African Hebrew Israelite religious services), the Court of Appeals ruled that he did not have to name the specific administrative officer(s) responsible for the decision. *Id.* "That [the plaintiff] didn't specifically name the defendants in the grievance was a mere technical defect that had no effect on the process and didn't limit the usefulness of the exhaustion requirement." (*Id.*) (citations omitted). But in the case currently before the Court, Plaintiffs did not even raise the issue of a skunk and groundhog infestation for correctional officials to address.

Plaintiff Buchanan filed an emergency grievance on December 6, 2016. (Deft. Exhibit E, p. 2.) The thrust of that grievance was that Buchanan was allegedly still in need of medical treatment some 9 days after the skunk encounter. (*Id.*, pgs. 2-3.) The 2-page grievance made a passing reference to the number of groundhog holes, but Buchanan requested only new clothes, medical treatment, and either a transfer to the Dixon Correctional Center (which is primarily a medical facility) or "reasonable compensation" for his skunk-spray-related injuries. (*Id.*) The fact that Buchanan framed the grievance as an emergency matter further supports an inference that the grievance centered on medical care. Even though the tone of Buchanan's grievance suggested that he seemed to hold

prison officials responsible for the incident, the grievance in no way stated that he wanted them to eradicate skunks and groundhogs at Stateville.

Like Buchanan, Campbell alluded to numerous groundhog holes along the prison walkway, but he asked only for "adequate treatment," "reasonable compensation," and replacement of shoes and clothing. (*Id.*; *see also* Pltffs. SGD, ¶ 15.) Campbell did assign blame for the skunk incident to the allegedly "unsafe and [un]sanitary conditions" at Stateville (R. 93-10, at p. 3). But Campbell did not request any relief in the form of stemming the tide of skunks and groundhogs at Stateville. Campbell's generalized statement in the subordinate clause of one sentence of a lengthy grievance cannot be characterized as directing the warden's attention to the need to combat wild animals on the prison grounds.

The circumstances of this case are more closely akin to those presented in *Stites v. Mahoney*, 594 F. App'x 303 (7th Cir. 2015) (unpublished). In that case, a prisoner filed a civil rights action against the former and current sheriffs, the jail administrator, two deputy sergeants, a doctor, and a nurse, alleging that all had been deliberately indifferent to his health by failing to develop and enforce effective policies to treat and prevent the spread of infectious diseases like Methicillin-resistant Staphylococcus aureus ("MRSA"). *See id.* at *304. Stites also alleged that the defendants had ignored his requests for treatment and misled him about the nature and risk of MRSA. Prior to filing suit, the plaintiff filed three grievances claiming that doctors and nurses had not followed the hospital's instructions to clean and wrap his hand, complaining about having to wait several hours for a nurse when he had severe stomach and chest pain that caused him to believe he had MRSA again, and alleging that one of the doctors was not properly tracking his medical records. *See id.*

The grievances, however, made no mention of the plaintiff's desire for policies to combat MRSA and other infectious diseases. On this basis, the district court found that the plaintiff failed to

exhaust his administrative remedies and dismissed the lawsuit, which the appellate court affirmed. *See id.*

Here, as in *Stites*, Plaintiffs' grievances did not put Defendant on notice that they were concerned about an alleged skunk and groundhog infestation, and did not give Defendant the opportunity to rectify the problem before they filed suit. The mere mention of groundhog holes and animals in grievances that principally sought medical attention and compensation for a skunk attack did not satisfy the administrative exhaustion requirement. Defendant has met his burden of establishing that Plaintiffs failed to exhaust administrative remedies on the subject of this lawsuit before filing suit.

In sum, Defendant has demonstrated that Plaintiffs failed to complete the administrative exhaustion process with respect to the claim they assert against him in this lawsuit. Accordingly, Defendant's motion for summary judgment is granted on grounds of non-exhaustion pursuant to U.S.C. § 1997e(a).

**B.     Defendant Has Not Violated Plaintiffs' Constitutional Rights**

For sake of completeness—and to forestall pointless future, post-exhaustion litigation—the Court will address the merits of Plaintiffs' claim. The Court finds that, irrespective of exhaustion, Plaintiffs do not have a triable Eighth Amendment claim against Defendant Pfister.

"Inmates have the right to 'humane conditions of confinement.'" *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prisoners' "basic human needs" must be met. *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 664 (7th Cir. 2012) (citations omitted). To that end, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Daugherty*, 906 F.3d at 611 (quoting *Farmer*, 511 U.S. at 832. Correctional officials

violate the Eighth Amendment when they show deliberate indifference to adverse conditions that deny "the minimal civilized measure of life's necessities." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (citing *Farmer*, 511 U.S. at 834).

An Eighth Amendment violation has both an objective and subjective component. *Daugherty*, 906 F.3d at 611. "First, the deprivation alleged must be objectively, sufficiently serious. *Id.* (quoting *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016) (per curiam)). "Second, the mental state of the prison official must have been one of deliberate indifference to inmate health and safety." *Daugherty*, 906 F.3d at 611 (quoting *Haywood*, 842 F.3d at 1031).

"The Constitution does not require that prisons be comfortable, and the fact that prison conditions are sometimes harsh is part of the price that convicted individuals … must pay for their charged offenses." *Moore v. Lemke*, No. 15 CV 1596, 2016 WL 4530308, at *5 (N.D. Ill. Aug. 30, 2016) (citations omitted); *see also McCree v. Sherrod*, 408 F. App'x 990, 992 (7th Cir. 2011) (non-precedential opinion) ("Routine discomfort is part of the penalty that prisoners pay for their offenses against society") (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). Prison conditions "may be uncomfortable, even harsh, without being inhumane." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (jail conditions). Mere discomfort and inconvenience do not implicate the Constitution. *See, e.g., Gonzalez v. Josephson*, No. 14 CV 4366, 2019 WL 1013737, at *20 (N.D. Ill. Mar. 4, 2019); *Giglio v. Cook Cty.*, No. 12 CV 6143, 2012 WL 3717812, at *2 (N.D. Ill. Aug. 27, 2012) (same).

Although the complaint survived threshold screening under 28 U.S.C. § 1915A, the Court concludes on the basis of the more fully developed record that Plaintiffs' exposure to skunks and groundhogs along a prison path did not rise to the level of a constitutional violation.

The Court recognizes that the presence of rampant pests may rise to the level of constitutional concern. *See, e.g., Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) ("Pest infestations may … form the basis of a Fourteenth or Eighth Amendment conditions of confinement claim") (citations omitted); *White v. Monohan*, 326 F. App'x 385, 388 (7th Cir. 2009) (unpublished) (though a "close case," plaintiff stated claim where he alleged that bugs, cockroaches, spiders, wasps, and bees bit and stung him so often that he sustained permanent injuries, including scars, wounds, sores, and internal injuries); *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (holding that "a prolonged pest infestation, specifically a significant infestation of cockroaches and mice, may be considered a deprivation" of constitutional magnitude); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (plaintiff's allegations that cockroaches "were 'everywhere,' 'crawling on his body' (along with mice) and 'constantly awaken[ing]' him, and 'causing the environment to be unsanitary'" stated a cognizable claim under 42 U.S.C. § 1983).

> In determining whether filth and infestation … would be enough to prove an Eighth Amendment violation, [the Court must consider] how extensive the infestation *of a prisoner's cell* is, what the infesting pests are, what odors or bites or risk of disease they create, what particular psychological sensitivities the prisoner was known to have (recall Winston's unreasoning fear of rats in *Nineteen Eighty–Four*, a fear exploited by his torturers to break his spirit without actually touching him, *Lindale v. Tokheim Corp.,* 145 F.3d 953, 955 (7th Cir. 1998)), and how long the infestation continues.

*Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016) (emphasis added) (quoting *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012)).

Depending on those criteria, summary judgment would be inappropriate if "a trier of fact might reasonably conclude that the prisoner had been subjected to harm sufficient to support a claim of cruel and unusual punishment even though he had not contracted a disease or suffered any physical pain." *Gray*, 826 F.3d at 1008 (quoting *Thomas*, 697 F.3d at 614). This is so because "[t]he potential psychological harm *from living in a small cell infested* with mice and cockroaches is pretty obvious." *Gray*,

826 F.3d at 1007 (emphasis added) (quoting *Thomas*, 697 F.3d at 615). Under the circumstances of

that case, the Court of Appeals found that the plaintiff's evidence of filthy living conditions, an alleged

lack of cleaning supplies, and prolonged pest infestation in his cell "present[ed] triable issues of fact

for a jury [to] determine the degree of both physical and psychological harm he suffered as a result of

the infestations and dirt." *Gray*, 826 F.3d at 1008.

Similarly, in *Byrd v. Hobart*, 761 F. App'x 621, 624 (7th Cir. 2019) (unpublished) the Court of

Appeals reversed summary judgment where the inmate-plaintiff provided ample evidence that the

prison kitchen was so overrun with mice and cockroaches as to create an unsanitary environment that

presented a "substantial and obvious" "risk of foodborne illness or worse" (citing *French v. Owens*, 777

F.2d 1250, 1255 (7th Cir. 1985) ("approv[ing] fully" the district court's determination that the prison

kitchen, commissary and food storage areas were unsanitary because they were infested with mice and

roaches, among other conditions, as well as the lower court's issuance of a general directive requiring

that the kitchen be maintained to provide inmates with safe, sanitary and nutritious food).

Moreover, in *Bentz v. Hardy*, the Court of Appeals reversed summary judgment for correctional

officials where the plaintiff showed that, beyond being excessively cold, his segregation cell had a light

switch that was an electrical hazard, and the cell was so infested with cockroaches and earwigs that,

despite the plaintiff's killing nearly 50 a day, the insects continued to crawl on him at night, keeping

him awake. 638 F. App'x 535, 537 (7th Cir. 2016) (unpublished). Plaintiffs also point to *Thomas v.*

*Studer*, where the district court denied defendants' motion for summary judgment based on the

plaintiff's allegations of "birds, vermin, and spiders in the inmate living units; fecal matter throughout

the living units; … black mold[,] … groundhogs and skunks … "mixing with prisoners[,] … [and]

water [that] was not fit to drink and that [coupled with the allegedly unsanitary conditions] caused him

to suffer digestive problems, fatigue, fever, and chills." No. 16 CV 8718, 2018 WL 5024957, at *2 (N.D. Ill. Oct. 17, 2018).

In the instant case, however, the Court concludes that Plaintiffs' exposure to skunks and groundhogs on a small stretch of prison grounds did not constitute a serious enough hardship as to implicate the Eighth Amendment. The present matter does not involve living conditions inside Plaintiffs' cell; they do not point to a safety issue of any immediacy, such as a lack of sanitary safeguards in the prison kitchen; and they do not contend that accompanying deprivations made the totality of their living conditions unconstitutional. Instead, Plaintiffs are complaining about animals along a single prison walkway, which is a relatively minor aspect of their overall confinement. While the Court recognizes that getting sprayed by a skunk is an undoubtedly unpleasant experience, it does not rise to a constitutional claim.

As noted above, Plaintiffs are entitled to conditions of confinement that do not amount to cruel and unusual punishment. But "[p]risons are not required to provide a 'maximally safe environment.'" *Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016) (quoting *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001)). Correctional officials "must [only] address easily preventable, observed hazards that pose a significant risk of severe harm to inmates." *Anderson*, 835 F.3d at 683 (citing *Withers v. Wexford Health Sources, Inc.*, 710 F.3d 688, 689 (7th Cir. 2013); *Smith v. Peters*, 631 F.3d 418, 420 (7th Cir. 2011); *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004)). Such risks include types of danger including, for example, "the acute risks posed by exposure to raw sewage, or inordinate levels of environmental tobacco smoke, or amputation from operating obviously dangerous machinery, or potential attacks by other inmates...." *Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004) (internal citations omitted); *Velazquez v. Kane Cty. Jail Adult Judicial Ctr.*, No. 13 CV 0644, 2013 WL 523827, at *2 (N.D. Ill. Feb. 11, 2013) (same).

16

This case does not approach that constitutional threshold. Plaintiffs cannot reasonably argue that they were subjected to a risk "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly." *Hoeft v. Harrop*, 366 F. App'x 681, 682 (7th Cir. 2010) (unpublished) (emphasis in original) (affirming summary judgment against inmate who claimed that denying his light-duty restriction and forcing him to unload a truck exposed him to the possible risk of developing carpal tunnel syndrome in the future) (quoting *Helling v. McKinney,* 509 U.S. 25, 36 (1993)); *Christopher*, 384 F.3d at 882 ("the risk of being hit by a softball as a result of a hazardous field condition is not one that 'today's society chooses not to tolerate'") (quoting *Helling*, 509 U.S. at 35); *Kelley v. Hardy*, No. 14 CV 1936, 2016 WL 3752970, at *6 (N.D. Ill. July 14, 2016) (same) (granting summary judgment for IDOC defendants because malfunctioning electric hair trimmers that shocked the plaintiff neither amounted to a sufficiently serious denial of a basic human need nor posed a substantial risk of serious harm) (citation omitted); *McMillen v. Tanner*, No. 12 CV 5100, 2012 WL 2839808, at *2 (N.D. Ill. 2012) (dismissing complaint on preliminary review where inmate stated that he fell and injured himself when he was forced to work on a defective concrete slab because "[t]he courts have consistently found such relatively minor, potential hazards" insufficiently serious to implicate the Constitution).

It is irrelevant whether Plaintiffs had to pass through a walkway populated with groundhogs and skunks once a day or many times a day. The Court assumes for purposes of summary judgment that Plaintiffs are not exaggerating the risks associated with that daily walk. The Court nevertheless concludes that the danger of being in close proximity to skunks and groundhogs in one prison corridor did not offend the Constitution. Even viewing the facts in the light most reasonable to Plaintiffs, no reasonable jury could return a verdict in their favor.

In the absence of an objectively serious condition, the Court has no occasion to consider whether Defendant Pfister acted with deliberate indifference. The Court nevertheless notes that

Plaintiffs would likely be hard-pressed to satisfy the subjective prong as well. "The subjective element 'requires more than negligence and it approaches intentional wrongdoing. The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness.'" *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015) (involving a pretrial detainee's claims of inadequate medical care) (quoting *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012)); *Weeks v. Warden*, No. 15 CV 5234, 2017 WL 3404965, at *5 (N.D. Ill. Aug. 7, 2017) (same) (involving allegations that correctional officials failed to protect the plaintiff from an assault by a fellow prisoner.

The parties reported in previous briefs that prison employees and/or exterminators set up cages and bait traps on the grounds. *See* R. 63, Memorandum Opinion and Order of October 1, 2018, at p. 3. Those measures would tend to reflect a good-faith—even if ineffectual and inconsistent, according to Plaintiffs—effort to control the pest problem during the time period in question. *Contrast Sain*, 512 F.3d at 895 (concluding that plaintiff could not prevail on claim of deliberate indifference where defendant had exterminated monthly and also at plaintiff's request whenever he reported cockroaches in his cell), with *Bentz*, 638 F. App'x at 537-38 ("evidence of a pest control contract alone does not necessarily exculpate the defendants since persisting in an ineffective method of pest control may be evidence of deliberate indifference").

Regardless, the record does not support an inference that Defendant Pfister was personally aware of the problem. "[I]f prison staff 'place a prisoner in a cell that has a cobra, but they do not know that there is a cobra there (or even that there is a high probability that there is a cobra there), they are not guilty of deliberate indifference even if they should have known about the risk, that is, even if they were negligent—even grossly negligent or even reckless in the tort sense—in failing to know.'" *Ramos v. Hamblin*, 840 F.3d 442, 445 (7th Cir. 2016) (quoting *Billman v. Indiana Dept. of Corrections*, 56 F.3d 785, 788 (7th Cir. 1995)).

Plaintiffs concede that neither of them wrote to Pfister, spoke to Pfister, or filed a grievance specifically relating to the purported infestation of skunks and groundhogs. *Compare Whitehead v. Dart*, No. 14 CV 1656, 2016 WL 7256958, at *6 (N.D. Ill. Dec. 14, 2016) (where inmates sued over unduly cold temperatures at the jail, granting summary judgment for certain defendants regarding whom the plaintiffs provided no evidence in the form of "testimony[,] affidavits, [or] [any]thing else in the record" to reflect that they personally complained to the officials in question about the lack of adequate heat in their cell). And even if Defendant *did* have direct, personal knowledge of the pest problem, his failure to abate that problem cannot reasonably be equated with criminal disregard of a substantial risk of serious harm.

## C.    Defendant Is Entitled to Qualified Immunity

Finally, the Court concludes that, under the circumstances of this case, Defendant Pfister is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (in turn, quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine of qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

"Qualified immunity is an affirmative defense, and once raised, the plaintiff bears the burden of defeating it by showing: (1) the defendant violated a constitutional right, and (2) that right was clearly established at the time of the alleged violation." *Sinn*, 911 F.3d at 418. "A failure to show

either is fatal for the plaintiff's case." *Id.* (quoting *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)). In this case, Plaintiffs have failed to carry their burden.

Recognizing that Plaintiffs are *pro se*, the Court has searched for case law concerning prison pest, rodent, and vermin infestations in general, and skunk and groundhog invasions in particular. But the Court has found no precedential authority providing direct guidance on how prison officials must respond in a situation similar to the one confronted here, where an ostensibly unmanageable population of wild animals occupied one, small section of prison grounds, as opposed to a pest infestation in an institutional kitchen or the prisoners' living quarters. This dearth of authority goes to the very heart of qualified immunity.

The Supreme Court has "repeatedly told courts … not to define clearly established law at a high level of generality." *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018). Instead, "[t]o be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right...." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (citations omitted); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (same). "Ordinarily, to show that the law was 'clearly established,' plaintiffs must point to a 'closely analogous case' finding the alleged violation unlawful." *Reed*, 906 F.3d at 547 (quoting *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)). "They need not point to an identical case, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reed*, 906 F.3d at 547 (quoting *Mullenix v. Luna*, --- U.S. ---, 136 S.Ct. 305, 308 (2015) (per curiam); *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) ("The law is 'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" (citation omitted)).

For Plaintiffs, that means that, even assuming that Defendant Pfister violated a constitutional right by acting with deliberate indifference to an incursion of skunks and groundhogs along an oft-used prison route (which, as discussed above, was not the case), he would be entitled to qualified immunity. *See Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) ("Only when precedent places the invalidity of a particular action beyond debate may damages be awarded"). Plaintiffs could not recover damages even if they established an Eighth Amendment violation.

Plaintiffs have strained mightily to manufacture a constitutional case. They have sued prison exterminators for failing to stamp out groundhogs and skunks, health care employees for failing to provide adequate medical attention for the effects of skunk spray, and the warden for failing to do enough to stem the tide of rodents. The malodorous after-effects of Plaintiffs' run-in with a skunk were undoubtedly unpleasant and embarrassing, but the incident simply does not justify over two years of federal litigation. The Court's and the parties' limited time and resources are better spent elsewhere.

## VII. Conclusion

For all of the foregoing reasons, the Court denies Plaintiffs' motion to strike summary judgment evidence [R. 97] and grants Defendant Pfister's motion for summary judgment [R. 93]. There is no genuine dispute as to any material fact, and Defendant has established that he is entitled to judgment as a matter of law. Defendant has shown that Plaintiffs failed to exhaust administrative remedies with respect to their remaining claim against the last Defendant in this lawsuit. In the alternative, Defendant is entitled to judgment as a matter of law on the merits because Plaintiffs cannot satisfy either the objective or subjective prong required for liability under the Eighth Amendment. No reasonable juror could return a verdict for Plaintiffs on their claim that they were subjected to

cruel and unusual conditions of confinement in having to use a walkway inhabited by skunks and groundhogs. In any event, Defendant has properly invoked qualified immunity.

The Court directs the Clerk to enter final judgment in favor of the sole remaining Defendant pursuant to Fed. R. Civ. P. 56. Civil case closed. The status hearing previously scheduled for May 11, 2020, at 9:30 AM is vacated.

If Plaintiffs wish to appeal, they must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If Plaintiffs appeal, they will each be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998); *Bentz v. Palmer*, No. 12 CV 1753, 2015 WL 1042932, at *5 (N.D. Ill. Mar. 5, 2015); *Boriboune v. Berge*, 391 F.3d 852, 855-56 (7th Cir. 2004) (inmate co-plaintiffs are each obligated to pay a full, separate statutory filing fee).

If the appeal is found to be non-meritorious, the Court of Appeals could assess Plaintiffs a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he or she is in imminent danger of serious physical injury. *Id.* If Plaintiffs seek leave to proceed *in forma pauperis* on appeal, they must file motions for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).

Plaintiffs need not bring a motion to reconsider this Court's ruling to preserve their appellate rights. However, if Plaintiffs wish the Court to reconsider its judgment, they may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the

deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

**IT IS SO ORDERED.**

Date: 2/25/2020

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge